947 F.2d 49
 60 USLW 2270
 PRAXIS PROPERTIES, INC.; and Praxis Properties, Inc. for
the State of New Jersey
v.
COLONIAL SAVINGS BANK, S.L.A.; the Resolution Trust
Corporation, Colonial Federal Savings Bank
v.
DYNAMIC INDUSTRIES COMPANY, INC.; Angelo M. Gregos;
Nicholas Poulous; and Sharp Construction Company, Inc.
Resolution Trust Corporation, as Receiver of Colonial
Federal Savings Association, Appellant.
 No. 90-5589.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6)
 April 29, 1991.
Decided Oct. 8, 1991.
As Amended on Denial of Rehearing
Nov. 13, 1991.
 
 Harold J. Cassidy, Roger J. Foss, Gregory R. Milne, Cassidy, Foss & San Filippo, Red Bank, N.J., for appellant.
 Susan Block-Lieb, Asst. Professor, Seton Hall Law School, Newark, N.J., Court-appointed Advocate for Legal Position of appellee.
 Before BECKER, HUTCHINSON, Circuit Judges and ATKINS, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This appeal, set in the context of the recent crisis in the savings and loan industry, presents the important question whether and for how long a federal district court must grant a receiver of an insured depository institution a stay after its appointment, under the stay provision of the the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C.A. § 1821(d)(12)(A)(ii) (West 1989). The district courts are sharply divided on the issue, and the only court of appeals to consider the provision did so only tangentially.
 
 
 2
 Before grappling with this question, however, we must clear three preliminary hurdles, appellate jurisdiction, justiciability, and exhaustion of administrative remedies. We conclude, on those points: (1) that there is jurisdiction over this appeal under the collateral order doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); (2) that the instant controversy is not moot, despite the passing of the 90 days during which the receiver claims that it was entitled to a stay and even though the underlying action has settled, because the issue is "capable of repetition, yet evading review," see Murphy v. Hunt, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); and (3) that for all practical purposes, Praxis exhausted its administrative remedies. On the merits, we hold that if the receiver of a depository institution makes its request under section 1821(d)(12)(A)(ii) within 90 days of its appointment, the district court then must stay the litigation until those 90 days after appointment have expired. That is, the district court has no discretion to decline a section 1821(d)(12) stay request based on alleged irreparable harm to other parties, but the court should not grant a section 1821(d)(12) stay lasting beyond 90 days after the receiver's appointment.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 3
 The material facts in this case are few and basically undisputed. On March 23, 1988, Colonial Savings Bank ("Colonial Savings"), a savings and loan institution, loaned $1.8 million to Praxis Properties, Inc. ("Praxis") and Dynamic Industries, Inc. ("Dynamic").[1] As partial security for this loan, Praxis gave Colonial Savings a $1 million mortgage on property it owned in West Long Branch, New Jersey. Sometime later, Praxis and Dynamic began to negotiate with Colonial Savings to modify the loan transaction and to release the collateral owned by Praxis. During those negotiations, but before a modification agreement was consummated, Colonial Savings failed.
 
 
 4
 On November 8, 1989, the Office of Thrift Supervision ("OTS") declared Colonial Savings insolvent and chartered Colonial Federal Savings Association ("Colonial Federal") as a federal "bridge" savings association under sections 301 and 501 of FIRREA. The next day, OTS appointed the Resolution Trust Corporation ("RTC") as receiver of Colonial Savings and conservator of Colonial Federal. RTC in its capacity as receiver of Colonial Savings then reached a "purchase and assumption" agreement with Colonial Federal whereby Colonial Federal purchased Colonial Savings's assets and assumed certain Colonial Savings liabilities. Among the assets that Colonial Federal purchased was Praxis's mortgage note.
 
 
 5
 Shortly after RTC's appointment as receiver and conservator, Praxis demanded that RTC release the mortgage note encumbering its property in West Long Branch. This demand precipitated extensive negotiations and discussions between RTC and Praxis, which proved unfruitful. On March 27, 1990, because RTC refused to relinquish Praxis's mortgage note, Praxis brought an action in the Superior Court of New Jersey to enforce its putative right to obtain the release. RTC then removed the action to the district court for the District of New Jersey under 12 U.S.C.A. § 1819(b)(2)(B) (West 1989).[2] In its capacity as both receiver of Colonial Savings and conservator of Colonial Federal, RTC also requested that the district court stay the action pursuant to 12 U.S.C.A. § 1821(d)(12) for 90 days running from the date of removal.
 
 
 6
 The district court heard oral argument concerning RTC's entitlement under section 1821(d)(12) to a 90-day stay. RTC argued that section 1821(d)(12) imposed on the district court an obligation to grant a stay for a full 90 days once requested by a receiver of an insured depository institution. In contrast, Praxis asserted that the district court was not bound to grant the requested stay. The stay provision, Praxis contended, was included in FIRREA to afford an appointed receiver (or conservator) "breathing room" to determine how best to proceed with litigation pending at the time of the receiver's appointment. In this case, Praxis observed, RTC was appointed receiver of Colonial Savings a full four months before the state-court litigation was initiated, and discussions between the parties concerning RTC's supposed obligation to release Praxis's mortgage note had been ongoing for months. Therefore, Praxis argued, the stay was not mandatory and should not be granted.
 
 
 7
 The district court was impressed equally by both parties' arguments:
 
 
 8
 [T]he legislative history makes clear that the purpose of the stay is to enable the RTC to familiarize itself with the factual and legal controversy into which it has been drawn. In the instant case the RTC was aware of the controversy before the instant litigation was filed. However, this court takes seriously the mandatory language of the statute.
 
 
 9
 The court thus opted to split the difference between the parties' positions. It granted RTC's motion for a stay, but limited the stay to 45 days:
 
 
 10
 [W]hile the court will grant [RTC's] motion for entry of a stay[,] [t]he stay ... will be limited for a period of 45 days. This appears to be consistent with the relevant statutory language and sufficiently protective of both parties.
 
 
 11
 Believing that it was entitled to a 90-day stay under section 1821(d)(12), RTC appealed the district court's order insofar as it limited the stay to 45 days.
 
 
 12
 While RTC's appeal was pending before this court, two noteworthy events occurred. First, the district court's 45-day stay lapsed, causing the litigation between RTC and Praxis to resume. Although RTC filed a brief with this court, Praxis, which no longer had any practical interest in RTC's entitlement to a 90-day stay under section 1821(d)(12), did not. We felt, however, that the issue presented by this appeal was difficult, and that its resolution by a court of appeals was extremely important to the efficient administration of Congress's Thrift Recovery Program, one of whose most expensive components is litigation. We accordingly appointed Susan Block-Lieb, Assistant Professor of Law at Seton Hall Law School in Newark, New Jersey, as amicus curiae to review the record and submissions thus far and to act as an advocate for the legal position previously advanced by Praxis.[3]
 
 
 13
 Second, after the appointment of Professor Block-Lieb, RTC and Praxis settled the underlying lawsuit and stipulated to dismissal. According to the terms of the stipulation, Praxis agreed to pay RTC as receiver for Colonial Savings approximately $1.8 million in exchange for a discharge of Praxis's mortgage note. The parties, however, specifically excluded from the stipulation the issues raised in this appeal.
 
 II. APPELLATE JURISDICTION
 
 14
 Before examining the merits of RTC's appeal, we must work our way through a complex jurisdictional maze. Although the issue was not flagged by the parties, we early on expressed concerns about the appealability of the district court's order. In response, RTC has advanced two alternative bases for our jurisdiction. It contends, initially, that the district court's order is immediately appealable under 28 U.S.C. § 1291 (1988) via the "collateral order doctrine." See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).[4] RTC also asserts that we have jurisdiction pursuant to 28 U.S.C. § 1292(a)(2) (1988), which affords the courts of appeals jurisdiction over appeals from:
 
 
 15
 Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property....
 
 
 16
 For the reasons that follow, we find that the district court's order granting a limited 45-day stay and thereby rejecting the claimed mandatory 90-day stay is appealable under the collateral order doctrine. We therefore will not comment on the applicability of section 1292(a)(2) to this appeal.[5]
 
 
 17
 In Cohen, the Supreme Court held that a "small class" of collateral orders are final and appealable under section 1291 even though they do not terminate the underlying litigation. 337 U.S. at 546, 69 S.Ct. at 1225. For an order to be appealable under Cohen 's collateral order doctrine, it must satisfy a three-pronged test:
 
 
 18
 First, the order must "conclusively determine the disputed question." Second, the order must "resolve an important issue completely separate from the merits of the action." Third and finally, the order must be "effectively unreviewable on appeal from a final judgment."
 
 
 19
 Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 276, 108 S.Ct. 1133, 1136-37, 99 L.Ed.2d 296 (1988) (citations omitted). If the order at issue fails to satisfy any one of the above requirements, it is not an appealable collateral order. 485 U.S. at 276, 108 S.Ct. at 1136-37. In addition, the collateral order doctrine has always has been construed narrowly by this court, " 'lest the exception swallow up the salutary general rule' that only final orders may be appealed." Yakowicz v. Pennsylvania, 683 F.2d 778, 783 n. 10 (3d Cir.1982) (quoting Rodgers v. United States Steel Corp., 541 F.2d 365, 369 (3d Cir.1976)); see also Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 430, 105 S.Ct. 2757, 2761, 86 L.Ed.2d 340 (1985) ("The collateral order doctrine is a 'narrow exception.' " (citation omitted)). We are nonetheless convinced that the district court's order granting a limited 45-day stay and rejecting the claimed mandatory 90-day stay meets each of the three requirements of the collateral order doctrine.
 
 A. The "Conclusiveness" Prong
 
 20
 In determining whether a non-final order "conclusively determine[s] the disputed question," the Supreme Court has contrasted two types of orders: those that are "inherently tentative" and those that, "although technically amendable, are 'made with the expectation that they will be the final word on the subject addressed.' " Gulfstream Aerospace, 485 U.S. at 277, 108 S.Ct. at 1137 (citations omitted). Two of the leading Supreme Court cases on "conclusiveness" both involved appeals of district court orders deciding whether to grant Colorado River stays.[6] The contrast between them is instructive here.
 
 
 21
 The Court held in Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), that a district court order granting a Colorado River stay was expected to be the final word on the subject and thus satisfied the "conclusiveness" prong of Cohen. The Court noted that an order granting a Colorado River stay "necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case" because a district court can invoke Colorado River only if it first determines that the parallel state proceeding "will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." 460 U.S. at 28, 103 S.Ct. at 943. It thus concluded that there was no reason to suppose that the district court would reconsider its decision to grant the Colorado River stay. Id. at 12-13, 103 S.Ct. at 935.
 
 
 22
 In contrast, the Supreme Court held in Gulfstream Aerospace that an order denying a motion to stay an action pursuant to Colorado River is "inherently tentative." The Court explained that a district court usually will expect to "revisit and reassess" an order denying a Colorado River stay in light of subsequent events that occur during the course of litigation:
 
 
 23
 A district court that denies a Colorado River motion does not "necessarily contemplate" that the decision will close the matter for all time. In denying such a motion, the district court may well have determined only that it should await further developments before concluding that the balance of factors to be considered under Colorado River warrants a dismissal or stay.... Thus, whereas the granting of a Colorado River motion necessarily implies an expectation that the state court will resolve the dispute, the denial of such a motion may indicate nothing more than that the district court is not completely confident of the propriety of a stay or dismissal at that time.
 
 
 24
 485 U.S. at 278, 108 S.Ct. at 1137-38 (citation omitted). Because an order denying a Colorado River stay is not "made with the expectation that it will be the final word on the subject addressed," the Court concluded that it is not immediately appealable. Id.
 
 
 25
 Praxis submits that the district court's order granting a limited 45-day stay pursuant to 12 U.S.C.A. § 1821(d)(12) was "inherently tentative," much like the order denying a Colorado River stay in Gulfstream Aerospace. Praxis reasons that the district court's order does not preclude RTC from seeking a further stay on some other related ground. For example, Praxis points out that RTC is free to request a 180-day stay of this action under 12 U.S.C.A. § 1821(d)(5), (6), and (7) (West 1989) on the ground that FIRREA and principles of judicial economy require a claimant against a failed savings and loan institution to exhaust the administrative claims procedure established by those subparagraphs before resorting to the courts for relief. See Part IV (discussing FIRREA's exhaustion of administrative remedies requirement).[7] Because the district court could still reconsider RTC's entitlement to some kind of stay, Praxis maintains that the court did not expect its order staying the litigation for 45 days to be the "final word on the subject" of a stay.
 
 
 26
 We think that Praxis misconstrues the first prong of Cohen. Although the district court's order was not the "final word" on RTC's entitlement to a stay for any and all reasons, it did conclusively determine the discrete legal question that is the subject of this appeal: RTC's statutory right to 90-day stay under 12 U.S.C.A. § 1821(d)(12)(A)(ii). Once the district court granted a limited 45-day stay, RTC's entitlement to a 90-day stay under section 1821(d)(12) was for all intents and purposes finally resolved. We can perceive of no circumstances under which the district court would revisit the legal question that RTC now appeals to this court. Because the district court undoubtedly expected its order granting a limited 45-day stay to resolve forever RTC's right to a stay under section 1821(d)(12), we conclude that the "conclusiveness" prong of the collateral order doctrine is satisfied.
 
 B. The "Importance / Separateness" Prong
 
 27
 Praxis also contends that the district court's order granting a 45-day stay and rejecting a 90-day stay does not "resolve an important issue completely separate from the merits of the action." In its submissions, however, Praxis has neglected the first half of the second prong of Cohen: whether RTC's appeal raises an "important issue." Because "[t]he importance of the right asserted has always been a significant part of [the] collateral order doctrine," Lauro Lines S.R.L. v. Chasser, 490 U.S. 495, 502, 109 S.Ct. 1976, 1980, 104 L.Ed.2d 548 (1989) (Scalia concurring), we must independently assure ourselves that the issue at bar is important enough to warrant an immediate appeal.
 
 
 28
 1. "Important Issue"
 
 
 29
 "[T]he type of 'important issue[s]' that the 'completely separate from the merits' requirement encompasses are those that are important in a jurisprudential sense." Nemours Foundation v. Manganaro Corp., New England, 878 F.2d 98, 100 (3d Cir.1989). See also Lauro Lines, 490 U.S. at 503, 109 S.Ct. at 1980 (Scalia concurring) (the right at issue must be "sufficiently important to overcome the policies militating against interlocutory appeals"); Nixon v. Fitzgerald, 457 U.S. 731, 742, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982) ("Cohen established that a collateral appeal of an interlocutory order must 'presen[t] a serious and unsettled question.' " (citation omitted)).
 
 
 30
 Whether section 1821(d)(12) obligates a district court to grant a receiver's request for a 90-day stay is a serious and unsettled question. The district courts have split over the nature of section 1821(d)(12). See Part V. Whereas some courts think that they must grant a receiver's request for a stay, others believe that section 1821(d)(12) is discretionary.[8] In addition, Congress has emphasized the importance of RTC's duties in reestablishing a firm foundation under the thrift industry. In so doing, Congress also recognized that RTC may find litigation stays necessary tools to facilitate fulfillment of that statutory mandate. Moreover, there is widespread public concern about the costs--including legal costs--of administering the thrift industry recovery program. See, for example, Comment, Is the Power of the RTC Unlimited?--Federal Preemption of State Banking Law, 18 FlaStULRev 995, 996 (1991) ("It was originally estimated that FIRREA would cost American taxpayers about $100 billion; however, recent estimates have ranged from a low of $500 billion to a high of over $1 trillion."). With the district courts split and RTC's performance of its duties so vital to the economy, we conclude that this appeal presents an issue that is "important enough in a jurisprudential sense to require an immediate interlocutory appeal." Nemours Foundation, 878 F.2d at 101.
 
 
 31
 2. "Completely Separate From the Merits"
 
 
 32
 The "separateness" requirement derives from "the principle that there should not be piecemeal review of 'steps towards final judgment in which they will merge.' " Moses H. Cone, 460 U.S. at 12 n. 13, 103 S.Ct. at 935 n. 13 (citation omitted). As the Supreme Court observed in Van Cauwenberghe v. Biard, 486 U.S. 517, 527-28, 108 S.Ct. 1945, 1952, 100 L.Ed.2d 517 (1988), "[a]llowing appeals from interlocutory orders that involve considerations enmeshed in the merits of the dispute would waste judicial resources by requiring repetitive appellate review of substantive questions in the case." Here, Praxis identifies several reasons why the court's stay order is not "completely separate from the merits" of the underlying action.
 
 
 33
 Praxis first argues that section 1821(d)(12) permits the district court to decline to grant a stay, if granting a stay would result in irreparable injury to the plaintiff. In reviewing the district court's finding of irreparable harm, Praxis maintains, the appellate court will inevitably be drawn into the merits of the action. This argument fails because, as we will explain below, it is premised on a misreading of the statute. See Part V.A. The controlling statutory language is unmistakably mandatory: If a receiver requests a stay in a timely fashion, the district court is required to grant it. Section 1821(d)(12)(B) affords a district court confronted with a timely motion for a stay no room to maneuver and to consider the possibility of irreparable injury. We therefore dismiss Praxis's first argument.
 
 
 34
 Praxis next points out that section 1821(d)(12) enables RTC to request a stay of up to 90 days only if RTC is acting in its capacity as receiver, rather than conservator, of an insured depository institution. To ascertain whether RTC is acting as receiver or conservator, Praxis contends, the district court--and, on appeal, the court of appeals--must consider aspects of the merits of the underlying suit. Similarly, Praxis asserts that section 1821(d)(12) limits the time period in which RTC may request a stay and that consideration of the timeliness of a request for a stay may immerse the reviewing court in the procedural history of the substantive dispute.
 
 
 35
 These arguments, though based on a correct reading of the statute, too must fail. Although we agree with Praxis that the district court must ascertain RTC's capacity and the timeliness of its request before granting a stay under section 1821(d)(12), we do not think that these determinations involve "considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (citation omitted). Rather, RTC's capacity and the timeliness of its request can be confirmed by a quick glance at the caption and at the date on which RTC was appointed. The reviewing court will not be thrust into the merits, as can be seen by contrasting these determinations with others that have been found inextricably intertwined with the merits.
 
 
 36
 For example, the Supreme Court concluded in Van Cauwenberghe that the denial of a motion to dismiss on forum non conveniens grounds was not separate from the merits. The Court stated that the district court in assessing a forum non conveniens motion must, among other things, "scrutinize the substance of the dispute between the parties to evaluate what proof is required." 486 U.S. at 528, 108 S.Ct. at 1953. Similarly, we held in Demenus v. Tinton 35 Inc., 873 F.2d 50, 52-53 (3d Cir.1989), that an order discharging a notice of lis pendens does not satisfy the "separateness" prong of Cohen. Applying the Van Cauwenberghe methodology, we concluded:
 
 
 37
 Because [the statute] requires the district court to determine the "probability that final judgment will be entered in favor of the plaintiff" in ruling on a motion to discharge a notice of lis pendens, we are indeed "thrust ... into the merits of the underlying dispute" when we review a district court order ruling on such a motion.
 
 
 38
 Id. at 52 (citations omitted). Returning to this same issue in Nemours Foundation, we held that an order certifying questions to a state supreme court is not separate from the merits. We noted that before deciding to certify the questions, the district court had to review the status of state law and determine whether the state-law questions were of first impression. 878 F.2d at 100 (citation omitted).
 
 
 39
 In contrast, when section 1821(d)(12) is properly applied, the decision to grant or deny a stay does not require (or, indeed, allow) an incursion into the merits of the dispute. The district court need not "scrutinize the substance of the dispute" and "evaluate what proof is required." Nor must it determine the "probability" that the plaintiff will prevail on the merits or review the status of applicable law. Instead, under the statute's mandatory language, the district court's inquiry is rather constrained: The court must simply determine whether RTC is acting as receiver or conservator and whether its request was timely made. These determinations are sufficiently ancillary to the underlying action that the reviewing court need not become "enmeshed" in the merits of the dispute. In this case, for example, we note that the court's decision to grant a limited 45-day stay had nothing to do with the merits of Praxis's action to secure the release of its mortgage note. We therefore conclude that the "separateness" prong of the collateral order doctrine is satisfied.
 
 C. The "Unreviewability" Prong
 
 40
 Lastly, Praxis contends that the district court's order granting a limited 45-day stay fails to satisfy the third requirement of Cohen. "To be appealable under ... the collateral-order doctrine ... an order must ... be such that review postponed will, in effect, be review denied." Zosky v. Boyer, 856 F.2d 554, 561 (3d Cir.1988). As the Supreme Court recently reiterated in Lauro Lines, an order is "effectively unreviewable" only " 'where the order at issue involves "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." ' " 490 U.S. at 499, 109 S.Ct. at 1978 (citations omitted). See also Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1985); Richardson-Merrell, 472 U.S. at 430-31, 105 S.Ct. at 2760-61.
 
 
 41
 In asserting that the district court's order is "effectively unreviewable" after a final judgment, RTC relies primarily on the Supreme Court's decision in Mitchell v. Forsyth. There the Court held that an order denying a claim of qualified immunity is immediately appealable under the collateral order doctrine, in large part because such an order is "effectively unreviewable" at the conclusion of litigation. An "essential attribute" of qualified immunity, the Court explained, is "an entitlement not to stand trial under certain circumstances." 472 U.S. at 525, 105 S.Ct. at 2815. Because qualified immunity is "an immunity from suit rather than a mere defense to liability," the Court determined that an official's right to qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." Id. at 526, 105 S.Ct. at 2815 (emphasis in original). See also Nixon v. Fitzgerald, 457 U.S. 731, 734, 102 S.Ct. 2690, 2693, 73 L.Ed.2d 349 (1982) (order denying a claim of absolute immunity is appealable under the collateral order doctrine).
 
 
 42
 On appeal, RTC analogizes the right to a stay under section 1821(d)(12) to the right to qualified immunity, arguing that the appealability of the district court's order follows a fortiori from Mitchell:
 
 
 43
 The nature of the right asserted was an unqualified right to obtain a cessation of litigation for a period of 90 or 45 days. Once the district court denied that right, the RTC was compelled to investigate the claim, review all of the documents of Colonial Savings, obtain outside counsel and make policy decisions in a truncated fashion. The prejudice suffered by such a decision cannot be reviewed upon appeal [from] a final judgment. In short, the right was forever lost.
 
 
 44
 The Supreme Court, however, has cautioned that Mitchell should not be read expansively:
 
 
 45
 The critical question, following Mitchell, is whether "the essence" of the claimed right is a right not to stand trial. This question is difficult because in some sense, all litigants who have a meritorious pretrial claim for dismissal can reasonably claim a right not to stand trial. But the final judgment rule requires that except in certain narrow circumstances in which the right would be "irretrievably lost" absent immediate appeal, litigants must abide by the district court's judgments, and suffer the concomitant burden of a trial, until the end of proceedings before gaining appellate review.
 
 
 46
 Van Cauwenberghe, 486 U.S. at 524, 108 S.Ct. at 1950 (emphasis added).
 
 
 47
 In Van Cauwenberghe, for instance, the Supreme Court held that an order denying a motion to dismiss based on a claim of immunity from civil process is not appealable under Cohen. The Court reasoned that a defendant's alleged immunity from service of process did not amount to an immunity from suit even though effective service of process is essential to the district court's exercise of personal jurisdiction. Because "the right not to be subject to a binding judgment of the court" would not be "irretrievably lost" without an immediate appeal, the Court concluded that the denial of defendant's claim of immunity from process is not "effectively unreviewable" following a final judgment. Id. at 527, 108 S.Ct. at 1952.
 
 
 48
 The Supreme Court similarly held in Lauro Lines that an order denying a motion to dismiss based on a contractual forum-selection clause is not "effectively unreviewable" at the end of litigation. Analyzing the issue in Mitchell terms, the Court stated that even assuming that the forum-selection clause affords the defendant the right to be sued only in a particular forum, the contract obviously does not entitle the defendant to avoid suit altogether. The Court therefore concluded:
 
 
 49
 [Defendant's] claim that it may be sued only in Naples, while not perfectly secured by appeal after final judgment, is adequately vindicable at that stage ... and hence does not fall within the third prong of the collateral order doctrine.
 
 
 50
 490 U.S. at 501, 109 S.Ct. at 1979. In so holding, the Supreme Court recognized that its decision might force the defendant to incur unnecessary expense. Id. at 499, 109 S.Ct. at 1978. The Court stated, however, that the costs associated with unnecessary litigation are insufficient by themselves to warrant an immediate appeal. The asserted right instead must be "one that is essentially destroyed if its vindication must be postponed until trial is completed." Id.
 
 
 51
 Seizing on the Court's reading of Mitchell in Van Cauwenberghe and Lauro Lines, Praxis insists that the district court's order is not "effectively unreviewable" following a final judgment. Whether section 1821(d)(12) is mandatory or discretionary, Praxis notes, it does not confer upon RTC total immunity from suit. Rather, Praxis observes, section 1821(d)(12) simply provides RTC with breathing room to plot its litigation strategy. Because the claimed right is the right to a brief respite from litigation, not the right to avoid trial altogether, Praxis contends that Van Cauwenberghe and Lauro Lines militate in favor of dismissing RTC's appeal.[9]
 
 
 52
 We disagree. Congress afforded RTC this right to a stay under § 1821(d)(12) because it realized that upon RTC's appointment as receiver or conservator for a failed thrift, RTC is likely to find the thrift in a state of profound disarray and may require some breathing room to orient itself and determine how best to proceed with pending litigation. If the district court denies a proper request for a stay under section 1821(d)(12), RTC's statutory right to a short litigation cease-fire, like a government official's right to qualified immunity, is "irretrievably lost" absent an immediate appeal.
 
 
 53
 On an appeal from final judgment, the court of appeals cannot turn back the clock to the time immediately following RTC's appointment and accord RTC its right under section 1821(d)(12) to a brief stay of all litigation so that it can get up to speed and contemplate its course of action. Once RTC's request is denied and the litigation proceeds apace, RTC incurs the very costs that section 1821(d)(12) was intended to forestall: It is thrust headlong into an ongoing case without time to familiarize itself with the facts and issues and to consider its strategy. Like the right to qualified immunity in Mitchell, therefore, the legal and practical value of RTC's right to a stay under section 1821(d)(12) is effectively lost unless it is vindicated before trial.
 
 
 54
 This situation can be contrasted with those in Van Cauwenberghe and Lauro Lines. The rights at issue in those cases can be restated as rights not to be sued in a particular forum. In holding that the orders were not appealable under Cohen, the Supreme Court fully acknowledged that the asserted rights could not be perfectly protected on appeal from final judgment. More specifically, the Court understood that if the district courts erroneously allowed those cases to go to trial, the defendants would incur unnecessary litigation expenses. But, the Court determined, the "essence" of those rights could be effectively vindicated after a final judgment: The court of appeals on an appeal from final judgment could dismiss the plaintiff's action, thus according the defendant (albeit belatedly) the relief it initially sought via an interlocutory appeal.
 
 
 55
 Here, however, the "essence" of RTC's right to a stay under section 1821(d)(12) cannot be vindicated after a final judgment. By erroneously denying RTC's request for a stay and compelling RTC to proceed with litigation, the district court imposes on RTC costs that are very different from unnecessary litigation expenses. As we explained above, unless RTC is afforded an immediate appeal, its statutory right to breathing room following its appointment is forever lost. We therefore conclude that the district court's order granting a limited 45-day stay is "effectively unreviewable on appeal from a final judgment."[10]
 
 
 56
 In sum, we hold that a district court's denial of a request for a stay under 12 U.S.C.A. § 1821(d)(12) satisfies each of the three requirements of the collateral order doctrine, and that it is accordingly an appealable "final decision" within the meaning of 28 U.S.C. § 1291.
 
 III. MOOTNESS
 
 57
 Having found that we have jurisdiction over RTC's appeal, we are next confronted with an issue of justiciability. The 90-day period for which RTC contends it was entitled to a stay has expired; moreover, the parties have settled the underlying case. After the district court granted a limited 45-day stay, RTC immediately appealed to this court, contending that it instead was entitled to a 90-day stay under 12 U.S.C.A. § 1821(d)(12). Since then, more than 45 days (indeed, more than 90 days) have elapsed, and the litigation against RTC not only resumed, but also was settled by the parties. For both reasons, our resolution of this appeal will have no direct, practical effect on the parties, thus raising the specter of mootness.
 
 
 58
 Under Article III of the Constitution, federal courts cannot adjudicate an issue unless they are presented with an actual "case or controversy." See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 395-96, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). A case is ordinarily moot, and hence nonjusticiable as lacking a "case or controversy," if " 'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " 445 U.S. at 396, 100 S.Ct. at 1208 (citation omitted). Here, RTC's appeal fails to present a "live" controversy both because the 90 days that are the subject of this appeal have long since passed and because the parties have amicably resolved their dispute.
 
 
 59
 Our inquiry, however, does not end here, for RTC contends that its appeal fits into an exception to the general mootness rule, namely the "capable of repetition, yet evading review" exception. It is well-settled that even when the question presented is no longer "live" and the parties lack a legally cognizable interest in the appeal, "a case may continue to decision and remain viable on appeal if the problem presented is 'capable of repetition yet evading review.' " Ameron, Inc. v. United States Army Corps of Engineers, 787 F.2d 875, 881 (3d Cir.1986). For this exception to apply, two elements must be present:
 
 
 60
 (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.
 
 
 61
 Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975)). We are convinced that RTC's appeal satisfies both prongs of the test.
 
 
 62
 To begin with, the stay provision at issue here involves far too short a time period for an appellate court ever to complete its review. The facts here are remarkably parallel to those in our earlier decision in Ameron. At issue there was the constitutionality of the automatic stay provision of the Competition in Contracting Act, 31 U.S.C. §§ 3551-3556 (1988) ("CICA"), which provides that an aggrieved bidder's filing of a protest with the Comptroller General automatically stays the awarding of a government contract during the pendency of the protest. 787 F.2d at 879. CICA also instructs the Comptroller General to issue a final decision on the protest within 90 days absent extenuating circumstances. Id. The aggrieved bidder in Ameron had filed a protest challenging the Army's awarding of a government contract, but the Army, which thought that the automatic stay provision was unconstitutional, proceeded with the contract at issue. Id. at 879-80. The bidder then brought suit in federal district court, seeking, among other things, a preliminary injunction to enforce the automatic stay provision and to restrain the Army's actions. Id. at 880. The district court granted the injunction, and the Army appealed.
 
 
 63
 While the Army's appeal was pending, however, the Comptroller General disposed of the bidder's protest, thereby obviating the need for a preliminary injunction. Id. Notwithstanding the apparent evaporation of the "live" controversy, we held that the Army's appeal remained justiciable because bid protests are usually resolved within 90 days, thus CICA's 90-day automatic stay provision was too short in duration for its constitutionality ever to be fully litigated and appealed. Id. at 881. Following Ameron, we think it readily apparent that the 45- to 90-day stay contemplated by section 1821(d)(12) is sufficiently brief to satisfy the "evading review" requirement. See also Roe, 410 U.S. at 125, 93 S.Ct. at 713 ("[T]he normal 266-day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete.").
 
 
 64
 Furthermore, RTC, the party seeking relief, is almost certain to face this same situation again in the future; in fact, it is a bit of an understatement to state that the issue is "capable of repetition." As we will explain in Part V, RTC already has been down this road several times in the past, having requested and been denied a 90-day stay under 12 U.S.C.A. § 1821(d)(12)(A)(ii). Given the shocking frequency with which savings and loans have been failing and the steady and unceasing flow of reported FIRREA litigation, we must assume that without a definitive ruling on RTC's right to a stay under section 1821(d)(12), this controversy will continue to recur. See Hunt, 455 U.S. at 482, 102 S.Ct. at 1184 ("[T]here must be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party." (citation omitted)). We therefore hold that this appeal also satisfies the second requirement of Hunt, and hence is not moot.
 
 
 65
 IV. OVERVIEW OF FIRREA; EXHAUSTION OF ADMINISTRATIVE REMEDIES
 
 
 66
 Before turning to the particular provision in dispute, the 90-day stay provision of FIRREA, 12 U.S.C.A. § 1821(d)(12), we first provide a thumbnail sketch of FIRREA as a whole. In so doing, we will also quickly dispose of one final potential jurisdictional question--Praxis's exhaustion of its administrative remedies.
 
 
 67
 In 1989 Congress enacted FIRREA, the most sweeping thrift reform law in the nation's history, to restore public confidence in the savings and loan industry and to reorganize the insolvent Federal Savings and Loan Insurance Corporation ("FSLIC"). See, for example, Comment, 18 Fla St U L Rev at 995. FIRREA created RTC, a wholly-owned government corporation that essentially took over the role of the FSLIC, to resolve the cases of insolvent or failed thrifts. 12 U.S.C.A. § 1441a(b)(1), (3) (West Supp 1991). See Michael P. Malloy, Nothing to Fear But FIRREA Itself: Revising and Reshaping the Enforcement Process of Federal Bank Regulation, 50 Ohio St LJ 1117, 1138 (1989). To facilitate this statutory mandate, FIRREA gave RTC broad powers to manage, sell, merge, consolidate, or liquidate failed thrifts. 12 U.S.C.A. § 1821(d)(2)(G) (West 1989).
 
 
 68
 FIRREA also created a comprehensive administrative procedure for adjudicating claims asserted against a failed depository institution. See United States v. Altman, 762 F.Supp. 139, 142 (S.D.Miss.1991); In re First City Nat'l Bank & Trust Co., 759 F.Supp. 1048, 1050-51 (S.D.N.Y.1991). Under 12 U.S.C.A. § 1821(d)(3) (West 1989), RTC as a receiver of an insolvent thrift initiates this process by giving prompt notice to the institution's creditors.[11] This notice informs the alleged creditors that they have (at least) 90 days from the initial publication of notice to present their claims against the assets of the thrift.[12] Once a creditor's claim has been presented, RTC has 180 days to consider the claim and to notify the claimant whether its claim has been allowed or disallowed. 12 U.S.C.A. § 1821(d)(5)(A) (West 1989).
 
 
 69
 If RTC denies a creditor's claim or fails to render a decision within the allotted 180-day period, then the claimant has 60 days to: (1) request an administrative review of the claim; or (2) file suit on the claim in the district court for the District of Columbia or in the district court in the district where the failed thrift's principal place of business is located; or (3) continue a judicial action commenced prior to the appointment of a receiver. 12 U.S.C.A. § 1821(d)(6)(A) (West 1989).[13] If the claimant elects to commence or continue a judicial proceeding, the court determines de novo the claim against the depository institution. See Bank of New England, N.A. v. Callahan, 758 F.Supp. 61, 63 (D.N.H.1991).
 
 
 70
 FIRREA expressly limits a claimant's ability to circumvent the above administrative claims procedure, providing for a strict limitation on judicial review:
 
 
 71
 Except as otherwise provided in this subsection, no court shall have jurisdiction over--
 
 
 72
 (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
 
 
 73
 (ii) any claim relating to any act or omission of such institution or Corporation as receiver.
 
 
 74
 12 U.S.C.A. § 1821(d)(13)(D) (West 1989). Section 1821(d)(13)(D) thus vests RTC with primary jurisdiction, in most circumstances, to determine a claim against a failed financial institution before judicial intervention.
 
 
 75
 There is an emerging jurisprudence of primary jurisdiction, though its contours are as yet far from clear. For example, we have held that if RTC has already been appointed receiver of a depository institution, a claimant must first comply with FIRREA's statutory procedures as a prerequisite to federal jurisdiction, no matter when the claim arose. See Rosa v. RTC, 938 F.2d 383, 392-93 (3d Cir.1991) petition for cert. filed 60 U.S.L.W. 3154 (U.S. Aug. 19, 1991 (No. 91-298). In other words, a claimant against a failed thrift must exhaust FIRREA's administrative remedies before commencing a judicial action. See Decrosta v. Red Carpet Inns Int'l, Inc., 767 F.Supp. 694 (E.D.Pa.1991) (dismissing claim against RTC for want of subject matter jurisdiction because plaintiff had not exhausted her administrative remedies).[14]
 
 
 76
 We conclude that Praxis did exhaust its administrative remedies here and was therefore entitled to be in court. FIRREA was enacted on August 9, 1989, and RTC was appointed receiver of Colonial Savings on November 9, 1989. Praxis originally brought this lawsuit in New Jersey state court on March 27, 1990, after RTC rejected its claim that it was entitled to the release of the mortgage note encumbering the West Long Branch property. During FIRREA's infancy, RTC was still developing its procedures for considering and allowing or disallowing claims. Although the claim consideration process that preceded this litigation may not have been as formalized as that required today, we are satisfied that under the circumstances Praxis did all it could do to exhaust its administrative remedies before filing suit. RTC's final rejection of Praxis's claim after protracted negotiations accordingly constituted a disallowal under section 1821(d)(5)(A), which permitted this lawsuit to proceed.
 
 
 77
 Congress's overriding purpose for requiring exhaustion of administrative procedures was to enable RTC "to dispose of the bulk of claims against failed financial institutions expeditiously and fairly." H.R.Rep. No 101-54(I), 101st Cong. 1st Sess. 1 at 419, 1989 USCCAN 86, 215. See also Tuxedo Beach Club II, 737 F.Supp. at 20 ("Congress has determined that these administrative procedures are the most efficient way to resolve the hundreds of claims with which a receiver might be confronted."). Here, Congress's concern was undoubtedly satisfied: Praxis presented its claim to RTC, and (after extensive discussions over many months) RTC rejected it. See also H.R.Rep. No 101-54(I) at 418, 1989 U.S.C.C.A.N. at 214 ("Resort to ... the District Courts ... is available only after the claimant has first presented its claim to [RTC]." (emphasis added)); Decrosta, 767 F.Supp. at 696 ("Courts which have considered the issue have held that these provisions, supported by the legislative history of FIRREA, require exhaustion of administrative procedures, at least to the extent of initial presentation of claims to RTC, prior to the assertion of a claim against RTC in court." (emphasis added)).
 
 
 78
 Because RTC did disallow Praxis's claim after months of negotiations, and because this case arose in the nascent stages of FIRREA, at which time RTC lacked a fully developed, standardized claims process, we conclude that 12 USCA § 1821(d)(13)(D) was not a bar to federal jurisdiction over this case. We do not mean to imply, however, that under today's regime, a mere breakdown of negotiations between RTC and a claimant would entitle the claimant to proceed in court.
 
 V. THE MERITS
 
 79
 We now turn to the merits of this appeal: the propriety of the district court's order granting a limited 45-day stay and rejecting RTC's request for a 90-day stay under 12 U.S.C.A. § 1821(d)(12). That section provides:
 
 
 80
 (A) In general
 
 
 81
 After the appointment of a conservator or receiver for an insured depository institution, the conservator or receiver may request a stay for a period not to exceed--
 
 
 82
 (i) 45 days, in the case of any conservator; and
 
 
 83
 (ii) 90 days, in the case of any receiver,
 
 
 84
 in any judicial action or proceeding to which such institution is or becomes a party.
 
 
 85
 (B) Grant of stay by all courts required
 
 
 86
 Upon receipt of a request by any conservator or receiver pursuant to subparagraph (A) for a stay of any judicial action or proceeding in any court with jurisdiction of such action or proceeding, the court shall grant such stay as to all parties.
 
 
 87
 (emphasis added)
 
 
 88
 We will first discuss whether a district court must grant the stay on proper request or, in contrast, whether it may deny the stay on grounds of irreparable injury or other equitable grounds. Then we will consider what a "90-day stay" means: whether the stay runs for 90 days from any date RTC requests it, or whether the stay runs for 90 days from RTC's appointment. RTC, relying on the "plain reading" of the statute, argues that it is entitled to a mandatory stay to last 90 days after any request at any point in the litigation. Praxis, not surprisingly, disagrees, believing the stay both discretionary and limited to 90 days after the receiver's appointment. For the reasons that follow, we conclude that both are half right--that under section 1821(d)(12), the stay is mandatory, but limited to the first 90 days after appointment.
 
 
 89
 A. Is a Stay Mandatory?
 
 
 90
 RTC contends that the district court erred in denying RTC's motion for a 90-day stay by failing to consider section 1821(d)(12) mandatory. In short, RTC asserts that section 1821(d)(12) requires courts to grant any request for a stay by a conservator or receiver of a failed financial institution, regardless of the potential harm that might result from the stay.
 
 
 91
 RTC bases this argument on the "plain" language of section 1821(d)(12). RTC emphasizes that subparagraph (B), entitled "Grant of stay by all courts required," provides that "[u]pon receipt of a request [by RTC for a stay] ... the court shall grant such stay as to all parties" (emphasis added). RTC insists that section 1821(d)(12) affords the court absolutely no leeway to consider the possibility of irreparable injury. Congress selected the mandatory language, RTC explains, because it fully appreciated RTC's need for certainty. According to RTC, Congress recognized the monumental task before RTC and the disarray that, as receiver of a failed thrift, it was likely to face. In choosing mandatory language and divesting the court of discretion, RTC reasons, Congress decided that RTC should not be distracted from the pressing responsibilities of reorganizing a failed thrift by the need to litigate on a case-by-case basis its entitlement to a stay under section 1821(d)(12).
 
 
 92
 This case, RTC argues, exemplifies precisely what Congress sought to avoid. Here, RTC points out, it was forced to divert its attention from its duties as receiver of Colonial Savings in order to pursue a stay of litigation. RTC contends that its limited financial and personnel resources were wasted needlessly on excessive briefing and argument over the propriety of the stay. These resources, RTC submits, should have been applied to resolving claims against Colonial Savings and to installing Colonial Federal as a viable successor institution.
 
 
 93
 RTC buttresses its position by citation to several district court opinions, most notably Prince George Joint Venture v. Sunbelt Savings, F.S.B., 744 F.Supp. 133 (N.D.Tex.1990). In Prince George, the court concluded that the 90-day stay provision of section 1821(d)(12) is mandatory. To hold otherwise, the court stated,
 
 
 94
 would relegate the straightforward command of Congress to the status of a statement of general policy to be disregarded when an individual judge deems the particular context to be sufficiently compelling. Section 1821(d)(12)(B) does not say a court "shall grant a stay except where the circumstances do not warrant it." Rather, the statute quite clearly makes the granting of relief obligatory.
 
 Id. at 135.[15]
 
 95
 Praxis, on the other hand, contends that FIRREA allows a court to reject a request for a stay when granting such a stay might result in irreparable injury. Praxis counters RTC's "plain language" position by arguing that had Congress intended to make the stay mandatory and to divest the court of an adjudicative role, Congress would have made the stay self-executing, much like the Bankruptcy Code's automatic stay provision, see 11 U.S.C. § 362(a)(1) (1988) (automatic stay of all actions against a debtor upon filing of a bankruptcy petition). Instead, Praxis points out, Congress required RTC to ask for a stay from the court with jurisdiction over the action. Because FIRREA provides for judicial involvement in the decision to stay litigation, Praxis reasons that Congress must have intended for the courts, when confronted with a request under section 1821(d)(12), to adjudicate certain factual and legal issues, including the possibility of irreparable harm.
 
 
 96
 As authority for this interpretation of section 1821(d)(12), Praxis offers Tuxedo Beach Club I, where the New Jersey district court denied RTC's motion for a 90-day stay even though RTC was appointed receiver of the defendant thrift only six days before it applied for a stay. 729 F.Supp. at 1510. The plaintiffs there alleged that the defendant S & L "had agreed to fund [their] land acquisition, development, and construction costs" of a condominium project. Id. at 1509. They further alleged that at the time the savings and loan failed, the project was half-built and particularly "vulnerable to weather and other elements which can cause its deterioration." Id. Because there was insufficient funding either to finish the project or protect it from the elements, plaintiffs averred that the delay that would flow from the court's grant of a stay would cause them irreparable injury.
 
 
 97
 The court was persuaded by this argument, despite the timeliness of RTC's request for a stay:
 
 
 98
 While acknowledging FIRREA, we still find this is not an appropriate case in which to grant a stay. Where plaintiffs are subject to imminent, irreparable harm from unnecessary delay, and the receiver has had sufficient time to familiarize itself with the factual and legal situation, a stay should not be granted.... Courts are to assume that Congress intended its legislation to have a reasonable effect. It would not serve the public interest to allow the waste which would result from an imposition of a stay in this case.
 
 
 99
 Id. at 1509-10. The court further determined that RTC really did not need a stay given the facts of that case: As of the hearing, RTC had been receiver for two months, the litigation had barely begun, and only a scheduling conference was soon forthcoming. Id. at 1510. Balancing RTC's need for a stay of proceedings against the threat to plaintiffs of irreparable injury should the stay be granted, the court denied RTC's request under section 1821(d)(12). Id.[16]
 
 
 100
 Like the plaintiffs in Tuxedo Beach Club I, Praxis alleged that it will be irreparably harmed if its lawsuit is stayed for 90 days. More specifically, Praxis asserted that it had a prospective purchaser for the property encumbered by the mortgage note at issue in this case. If the district court stayed its action to compel the release of the mortgage note, Praxis speculated that it was likely to suffer irreparable harm because its prospective purchaser might lose interest during the stay.
 
 
 101
 We agree with RTC that the language of section 1821(d)(12)(B) is unmistakably mandatory and precludes a district court from factoring the prospect of irreparable injury into its decision to grant or deny a stay. It is hard to imagine language more straightforward than that of section 1821(d)(12)(B). That subparagraph is best summed up by its title: "Grant of stay by all courts required." The wording is clear and unqualified: "Upon receipt of a request by any ... receiver ... for a stay ... the court shall grant a stay as to all parties." Congress simply has left no room in section 1821(d)(12)(B) for courts to maneuver and balance RTC's need for a stay against the possibility that delay will result in irreparable harm to the party opposing the stay. Were we to read into subparagraph (B) an exception that would allow the court to reject a request for a stay whenever it deems a stay to be either inappropriate or unnecessary, we would be rewriting, not interpreting, Congress's language.
 
 
 102
 Like RTC, we think that Congress couched section 1821(d)(12) in mandatory language to foster certainty and to preclude case-by-case adjudication over RTC's need for a stay. Congress apparently thought it important to enable RTC to stay litigation without having to expend precious time and resources persuading a court about its need for a stay and refuting the other party's assertions of irreparable injury. With respect to the mandatory nature of section 1821(d)(12)(B), we thus adopt the reasoning of the Northern District of Texas in Prince George and reject the analysis of the District of New Jersey in Tuxedo Beach Club I. If a conservator or receiver of an insured depository institution requests a stay of proceedings under section 1821(d)(12)(A) in a timely manner, see Part V.B, the district court is obligated to grant such a stay. To the extent, therefore, that Praxis's assertion of irreparable injury factored into the district court's decision to limit RTC to a 45-day stay, the court erred.
 
 
 103
 B. What is a Timely Request and How Long Does the Stay Run?
 
 
 104
 RTC would also have us hold that it may request a stay of 90 days at any time after its appointment. Again, RTC relies on the allegedly "plain" meaning of 12 U.S.C.A. § 1821(d)(12), this time subparagraph (A). It will be helpful to set out subparagraph (A) again in full:
 
 
 105
 After the appointment of a conservator or receiver for an insured depository institution, the conservator or receiver may request a stay for a period not to exceed--
 
 
 106
 (i) 45 days, in the case of any conservator; and
 
 
 107
 (ii) 90 days, in the case of any receiver,
 
 
 108
 in any judicial action or proceeding to which such institution is or becomes a party.
 
 
 109
 12 U.S.C.A. § 1821(d)(12)(A). Under the plain language of the statute, RTC argues, the decision when and whether to request a stay and the length of the stay are matters within its sound discretion as conservator or receiver. The language of section 1821(d)(12)(A), it once again contends, is straightforward and unambiguous. Nothing, in RTC's view, expressly (or impliedly) limits its unilateral right to a stay to a 45- or 90-day period immediately following its appointment. And once again, RTC invokes the reasoning of the court in Prince George Joint Venture v. Sunbelt Savings, F.S.B., 744 F.Supp. 133 (N.D.Tex.1990), which held that the statute imposes no temporal limitation on RTC's ability to request a breather:
 
 
 110
 Section 1821(d)(12)(A) states that a request for a stay may be made "[a]fter the appointment of a conservator or receiver;" the law does not impose any particular timing requirement following appointment. Congress left to the conservator or receiver the discretion to decide when it needed the breathing room. The court may not modify the exercise of that discretion in the face of Congressional intent that is clearly to the contrary.
 
 
 111
 Id. at 135.
 
 
 112
 Praxis counters that section 1821(d)(12) does limit RTC's ability to obtain a stay of proceedings to the initial 90 or 45 days of a receivership or conservatorship. Praxis derives this argument primarily from the basic purpose of section 1821(d)(12): The stay provision of section 1821(d)(12) was added to afford RTC some breathing room immediately following its appointment. According to the House Committee Report on FIRREA:
 
 
 113
 The appointment of a conservator or receiver can often change the character of litigation; the stay gives the [conservator or receiver] a chance to analyze pending matters and decide how best to proceed.
 
 
 114
 H.R.Rep. No. 101-54(I), 101st Cong., 1st Sess. 1, 331 in 1989 U.S.C.C.A.N. 86, 127.
 
 
 115
 Praxis also cites the House and Senate versions of this subparagraph, both of which permitted the receiver/conservator to request a stay of proceedings, but apparently limited its right to do so to the time period immediately following its appointment. The House version provided:
 
 
 116
 (6) The conservator or receiver may request a stay for a period of up to 90 days after the appointment of the receiver as to any legal action or proceeding to which the financial institution in default is or may become a party. Upon petition, the court shall grant such a stay as to all parties.
 
 
 117
 H.R. 1278, sec. 212(5), 101st Cong., 1st Sess. 97 (June 20, 1989).[17] The Senate version of FIRREA similarly provided:
 
 
 118
 (7) STAYS.--The Corporation may request a stay for a period of up to 45 days after the appointment of the receiver as to any judicial action or proceeding to which the receiver or the financial institution in default is or may become a party. Upon petition, the court shall grant such a stay as to all parties.
 
 
 119
 S. 774, sec. 212(a), 101st Cong., 1st Sess. 66 (April 19, 1989), in Fed Banking L Rep (CCH) No 1281 (April 25, 1989) (emphasis added).
 
 
 120
 According to Praxis, both versions of this subparagraph, due to the placement of the phrase "after the appointment," confirm that the appointment of RTC commences the running of the 45- or 90-day stay period. For example, as Praxis reads the House version, if RTC requested a stay five days after its appointment as receiver, then it would be entitled to an 85-day stay. Similarly, if RTC requested a stay 91 days or more after its appointment (as it did here), on this view RTC would not be entitled to any stay.
 
 
 121
 The current version of section 1821(d)(12), Praxis reminds us, is a compromise between the House and Senate versions that was hammered out by the House-Senate Conference Committee. By moving the "after the appointment" phrase to the beginning of the subparagraph, Praxis concedes that the Conference Committee rendered somewhat awkward the reading of section 1821(d)(12) that it advances here. Praxis further acknowledges that section 1821(d)(12), as written, could be read to provide that RTC can request a stay at any time after its appointment. Nonetheless, Praxis argues that because both the House and Senate agreed that RTC's right to a stay should be limited to the initial 45 or 90 days after its appointment, the House and Senate conferees were unlikely to jettison that aspect of section 1821(d)(12) in compromising the differences between their Houses' respective versions of the subparagraph. When a bill is sent to conference, ordinarily only matters where the houses disagree are before the conferees. See, for example, H.R.Doc. No. 100-248, 100th Cong., 2d Sess §§ 531, 546 (1988) (absent waiver of House Rules, conference managers must confine themselves to the differences between the houses).
 
 
 122
 In addition, Praxis argues that a contrary construction of section 1821(d)(12)--that is, an interpretation that would allow RTC to obtain a 45- or 90-day stay at any time during its tenure as conservator or receiver--would conflict with the provisions of FIRREA that establish the administrative claims procedure. Praxis points out that if section 1821(d)(12) entitles RTC to a stay at any time, RTC then can obtain a stay of a judicial action brought by a claimant who, after exhausting its administrative remedies, seeks de novo review of RTC's determination. Affording RTC a right to a stay in this situation, Praxis asserts, would be inconsistent with the intended purpose of section 1821(d)(12): Having already reviewed a creditor's claim for up to 180 days, RTC would not require "breathing room" in which to get up to speed. Praxis suggests, instead, that it makes more sense to construe section 1821(d)(12) as confining RTC's right to a stay to the initial 45 or 90 days following its appointment, because at that time (and only at that time) RTC may require breathing room to give notice to the failed financial institution's creditors and to initiate the administrative claims procedure.
 
 
 123
 Praxis also refers us to FDIC v. Taylor, 727 F.Supp. 326 (S.D.Tex.1989). There the FDIC, six months after its appointment as receiver for a failed depository institution, requested a 90-day stay under section 1821(d)(12). In rejecting that request, the court reasoned:
 
 
 124
 The legislative history of FIRREA indicates that the 90-day stay provision was enacted to allow the FDIC receiver "breathing room" immediately following its appointment.... The statute was not enacted to give FDIC the power to stay proceedings to which it is a party at any point, regardless of the length of its involvement. This Court declines to grant FDIC a stay in a case in which it has been a party for six months.
 
 Id. at 327-28.[18]
 
 125
 In Praxis's view, this case is analogous to Taylor in that RTC requested a stay under section 1821(d)(12) more than 90 days (indeed, more than five months) after it was appointed receiver of Colonial Savings. Moreover, Praxis notes that it did not bring this action in state court until more than four months after RTC's appointment, following months of extensive negotiations and discussions with RTC concerning the release of Praxis's mortgage note. Under these circumstances, Praxis asserts, the substance of this case came as no surprise to RTC, thus foreclosing the possibility that RTC needed "breathing room" to familiarize itself with the litigation. In short, Praxis contends that in light of the legislative history of section 1821(d)(12), RTC's request for a stay was untimely, even though that subparagraph as finally enacted may not appear to impose a temporal limitation upon first reading.[19]
 
 
 126
 For our part, we start by noting that RTC carries its "plain meaning" argument a bit too far. While we have agreed that section 1821(d)(12)(B) straightforwardly requires the court to grant a proper request for a stay, we do not read subparagraph (A) as unambiguously affording RTC carte blanche to stay a judicial proceeding at any time it feels it needs a 90-day break from the rigors of litigation. Were the language of subparagraph (A) as clear as that of subparagraph (B), we would be compelled to follow its plain meaning; unfortunately, the meaning of subparagraph (A) is not so plain as RTC suggests.
 
 
 127
 If subparagraph (A) is studied carefully, two latent ambiguities emerge. The first difficulty is the word "for" in the construction "the conservator or receiver may request a stay for a period not to exceed [45 or 90 days]." "For" could refer to how long the stay will last--a stay "of" 90 days, as RTC contends. Alternatively, "for" could refer to the time period during which a stay may be timely requested--a stay to be granted "during" the 90 days, as Praxis contends.
 
 
 128
 Second, the phrase "[a]fter the appointment ..." might or might not modify the 90-day limitation. Under RTC's "plain" reading, "[a]fter the appointment" modifies the whole subparagraph, but it then becomes curiously superfluous: The receiver certainly could not request a stay before its appointment. According to Praxis, "[a]fter the appointment" was meant to qualify the 90-day period, despite the modifier's placement at the beginning of the subparagraph well away from the time limitations. The parties thus face us with a choice between a reading that would render a key phrase superfluous and one that suggests that Congress's phrasing was at best inartful.
 
 
 129
 As a result of these ambiguities, we can conceive of three plausible readings of the statute:
 
 
 130
 (1) RTC's Interpretation: the statute entitles the receiver to a stay lasting 90 days at any time the receiver requests after its appointment (i.e., always);
 
 
 131
 (2) Praxis's Interpretation: the statute entitles the receiver to a stay whose outer bound is 90 days after the receiver's appointment (no matter when the receiver requests the stay);
 
 
 132
 (3) An Alternative Interpretation: the statute requires that the receiver request a stay within 90 days after its appointment, but imposes no durational limit on the stay so long as it was timely requested.[20]
 
 
 133
 Such a quandary, we believe, lands us well outside the realm of "plain meaning" and fully justifies resort to legislative history and statutory purpose as interpretive aids.
 
 
 134
 The legislative history and purpose of section 1821(d)(12) compel us first to reject RTC's interpretation. As to the aim of section 1821(d)(12), we agree that "the 90-day stay provision was enacted to allow the ... receiver 'breathing room' immediately following its appointment." Taylor, 727 F.Supp. at 327-28. This purpose suggests that we construe section 1821(d)(12)(A) to confine RTC's right to request a stay to the initial period following its appointment, rather than to grant RTC a free timeout at any time during the litigation.
 
 
 135
 The House and Senate bill versions of this subparagraph, which ultimately were merged to form present section 1821(d)(12), further underscore the soundness of the timely request requirement we find in the statute. The earlier versions provide the clue that is necessary to unlock the hidden meaning of the "[a]fter the appointment" language in the ultimate statute. As we noted above, the House and Senate allowed the receiver to "request a stay for a period of 90 [45 in the Senate version] days after the appointment of the receiver." Because no substantive difference between these Senate and House versions existed other than the number of days, we believe the compromise continued the earlier linkage between "90 day" and "after the appointment." Most likely, the phrase "after the appointment" was moved to its current ambiguous location at the beginning of the subparagraph only because the conferees elected to use different time limits for receivers and conservators. Attempting to avoid making the statute cumbersome, the conferees unwittingly introduced the current ambiguity.
 
 
 136
 We are therefore confident that Congress intended that a receiver request its section 1821(d)(12) stay within 90 days of its appointment.[21] For us the more difficult question is how long that stay should last--whether the stay expires at the end of the 90 days following appointment, or whether the duration rests in the discretion of the receiver.[22] The legislative history provides us with no clear answers: The earlier versions both used the ambiguous "for," and the committee reports enlighten us no further.
 
 
 137
 Forced to a choice, however, we think that Praxis's interpretation of a fixed outer limit on the stay is more consistent with the congressional purpose. We fear that allowing receivers unfettered discretion to set the length of their stays could lead to abuse: Time to breathe and catch up with the litigation could easily become time to doze and avoid facing legal disputes. Congress intended to allow receivers to delay litigation, not postpone it indefinitely.
 
 
 138
 Under our interpretation of section 1821(d)(12), therefore, RTC is entitled to a 90 day stay if it seeks the stay immediately after its appointment as receiver. If RTC lingers and fails to request a stay for 30 days after its appointment, its stay remains mandatory but will only last the remaining 60 days of the 90-day period following appointment. Where, as here, more than 90 days have passed since RTC's appointment, it is not entitled to a stay under section 1821(d)(12).
 
 VI. CONCLUSION
 
 139
 In sum, we hold that 12 U.S.C.A. § 1821(d)(12), when interpreted in light of its purpose and legislative history, limits the right of a receiver of a failed thrift to stay a judicial action to the initial 90 days after its appointment. If the receiver requests a stay within 90 days of its appointment, it is automatically entitled to such a stay under section 1821(d)(12), but the stay expires no later than 90 days after the appointment. Here, because more than 90 days had elapsed since RTC's appointment as receiver of Colonial Savings when RTC requested the stay, we conclude that the district court erred in granting RTC any stay under section 1821(d)(12).
 
 
 140
 The order of the district court will be vacated. Parties to bear their own costs.
 
 
 
 *
 The Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Dynamic, although a party in the district court, is not a party to this appeal
 
 
 [2]
 12 USCA § 1819(b)(2)(A) deems all suits to which RTC, in any capacity, is a party to "arise under the laws of the United States," subject only to a limited exception set forth in subsection (D). See Lazuka v. FDIC, 931 F.2d 1530, 1533-38 (11th Cir.1991). In this action, RTC is a named defendant, both as receiver of Colonial Savings and conservator of Colonial Federal. We will further discuss the district court's jurisdiction over this action below
 
 
 [3]
 Professor Block-Lieb filed a comprehensive and well-reasoned opposing brief with this court, and we appreciate her superb efforts. For the sake of clarity, however, we will refer to the arguments made by Professor Block-Lieb as Praxis's own
 
 
 [4]
 28 U.S.C. § 1291 provides:
 The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States....
 
 
 [5]
 The parties' subsequent settlement has added an additional wrinkle to the jurisdictional riddle: Has the finality concern now disappeared, even as an additional mootness problem has arisen? The uncertainty inheres from the fact that RTC appealed from an interlocutory (that is, non-final) order of the district court. Section 1291 generally limits the jurisdiction of the courts of appeals to "final decisions" of the district courts. A "final decision" is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). If the order appealed from is not "final," and there is no exception that makes the non-final order immediately appealable, the court of appeals is obliged to dismiss the appeal as premature. The appellant, however, is free to renew its claim of error in a later appeal following a "final decision." This rule reflects federal policy against piecemeal appeals: "a party must ordinarily raise all claims of error in a single appeal following final judgment on the merits." Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 374, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981)
 While this appeal was pending the parties amicably resolved all the issues in this lawsuit except the propriety of the stay. Therefore, this appeal, though taken from an interlocutory order, will be the only appeal in this case. As a result, this lawsuit no longer poses a threat of piecemeal appeals. Ignoring mootness concerns for the moment, logically we should decide the merits of Praxis's appeal whether or not the district court's order is appealable under the collateral order doctrine. Otherwise, either (1) RTC would be allowed to file another appeal immediately because a "final" judgment now has been entered in this case (in which case our dismissal would be pointless), or (2) RTC would be barred from filing another appeal because the 30-day appeal time under FRAP 4(a) has run since the "final" judgment was entered (in which case RTC would lose its right to an appeal due to a procedural oddity).
 Arguably RTC's appeal, even if it was filed prematurely, ripened once the remaining claims in this case (the impediments to finality) were settled and dismissed. See, for example, Cape May Greene, Inc. v. Warren, 698 F.2d 179, 184-85 (3d Cir.1983) (notice of appeal prematurely filed while a cross-claim still was pending in the district court held to ripen on the date that the cross-claim was dismissed). See also FirsTier Mortgage Co. v. Investors Mortgage Ins. Co., --- U.S. ----, 111 S.Ct. 648, 112 L.Ed.2d 743 (1991); New Castle County v. Hartford Accident & Indemnity Co., 933 F.2d 1162, 1178 (3d Cir.1991). The parties, however, have not briefed this issue. Because the unusual circumstances of this appeal are unlikely to recur, and because we conclude anyway that the district court's order was appealable under the collateral order doctrine, we too will avoid this sticky question.
 
 
 [6]
 Under Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), a federal court may on extremely rare occasions stay its proceedings and defer to a concurrent state case on grounds of sound judicial administration
 
 
 [7]
 Compare Tuxedo Beach Club Corp. v. City Fed. Sav. Bank, 729 F.Supp. 1508 (D.N.J.1990) ("Tuxedo Beach Club I ") (district court declined to grant RTC's motion for a 90-day stay under section 1821(d)(12)) with Tuxedo Beach Club Corp. v. City Fed. Sav. Bank, 737 F.Supp. 18 (D.N.J.1990) ("Tuxedo Beach Club II ") (same court granted RTC's request for a 180-day stay of the same action pursuant to section 1821(d)(5), (6), and (7))
 
 
 [8]
 Compare Prince George Joint Venture v. Sunbelt Sav., F.S.B., 744 F.Supp. 133 (N.D.Tex.1990) (90-day stay provision of section 1821(d)(12) is mandatory) with Tuxedo Beach Club I, 729 F.Supp. at 1510 (declining to grant a 90-day stay because of imminent threat of irreparable harm)
 
 
 [9]
 Praxis also relies on our decision in Gold v. Johns-Manville Sales Corp., 723 F.2d 1068 (3d Cir.1983). Gold involved an action against several manufacturers, distributors, and suppliers of asbestos products. Before trial, two of the defendants filed a bankruptcy petition under Chapter 11. Citing the automatic stay provision of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 362(a)(1) (1988), several nonbankrupt defendants moved in the district court for an order staying all further proceedings. The district court denied this motion, and the defendants appealed
 In dismissing defendants' appeals for want of jurisdiction, we held that the court's order was not appealable under Cohen. The panel, however, did not make clear which prong of Cohen the court's order failed to satisfy. The bulk of the panel's discussion appears to relate to the importance/separateness prong; arguably the panel rejected the defendants' argument under the collateral order doctrine because, after reviewing prior case law, it determined that the court's order was not important enough to warrant an immediate appeal. However, the last line of the section of the opinion dealing with Cohen did state that the issue was effectively reviewable on appeal from final judgment.
 We conclude that Gold is not controlling here. Gold is factually quite distinguishable: For one thing, the appellants in Gold had no claim that they needed "breathing room," as does RTC. Moreover, in view of the difficulty in ascertaining the decision's rationale, it provides an uncertain guide to the result on the facts here.
 
 
 [10]
 There remains one final piece to the jurisdictional puzzle, involving the intersection between the mootness and the collateral order doctrines. As we will discuss in Part III, RTC's appeal is arguably moot since the 90 days to which RTC contends it was entitled have long since elapsed. In fact, one could further argue that this appeal became even more moot, if there are degrees of mootness, when the parties settled their dispute. We nonetheless will conclude in Part III that this appeal presents a justiciable controversy because 90 days is such a short time period that it always will have expired by the time RTC's entitlement to a stay under section 1821(d)(12) is appealed to this court and litigated. Hence, the issue presented by this appeal is "capable of repetition, yet evading review." Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973). See also Ameron, Inc. v. United States Army Corps of Engineers, 787 F.2d 875, 881 (3d Cir.1986)
 This conclusion, however, may be in tension with our determination that the district court's order is appealable under Cohen. To a certain extent, it is logically inconsistent for us to hold both that the right at issue cannot be vindicated in the absence of an immediate appeal yet that the right can never be vindicated by an interlocutory appeal because the 90-day time period is too short. At a theoretical level, if RTC's rights under section 1821(d)(12) are never effectively reviewable, then perhaps RTC should wait until a final order is entered and only then appeal the district court's order partially denying its request for a stay along with any other allegations of error.
 In light of the special circumstances of this appeal, however, we need not attempt to cut this Gordian knot. Because the parties have amicably resolved their entire dispute except for this one issue and there is no longer a case ongoing in the district court (hence there will never be another, final order), it would make no sense to dismiss RTC's appeal. See note 5.
 
 
 [11]
 For convenience, throughout this opinion we use "RTC" to refer generically to the "Corporation" that has been appointed conservator or receiver of a failed financial institution. In some cases, however, that Corporation is actually the Federal Deposit Insurance Corporation ("FDIC"), not the Resolution Trust Corporation
 
 
 [12]
 12 U.S.C.A. § 1821(d)(4) (West 1989) empowers RTC to "prescribe regulations regarding the allowance or disallowance of claims ... and providing for administrative determination of claims and review of such determination."
 
 
 [13]
 If within 60 days the claimant fails to pursue one of the above three routes authorized by section 1821(d)(6)(A) for review of RTC's denial of its claim, RTC's denial of the claim becomes a final determination. 12 U.S.C.A. § 1821(d)(6)(B) (West 1989)
 
 
 [14]
 The situation is slightly different, however, where a claimant files its action against a depository institution before the institution becomes insolvent and is placed in receivership. In that case, the failure of the thrift and the appointment of RTC as receiver would appear not to divest the federal court of jurisdiction, for "[i]t is a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint," Rosa, 938 F.2d at 392 n. 12. See also 12 U.S.C.A. § 1821(d)(12)(A)(i) (West 1989) ("Subject to paragraph (12), the filing of a claim with the receiver shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the receiver."). But see New Maine Nat'l Bank v. Reef, 765 F.Supp. 763, 766 (D.Me.1991) ("[T]he statutory language of sections 1821(d)(13)(D)(i) and (ii) divests the Court of substantive jurisdiction over claims of the specified nature pending the working out of the administrative claims process provided for by the statute or until the lapse of the designated time provided therefor.")
 The 90-day stay of section 1821(d)(12) would appear to protect RTC in such circumstances. See 12 U.S.C.A. § 1821(d)(5)(F)(ii) (subject to the 90-day stay provision of section 1821(d)(12), filing of claim with receiver does not prejudice right to continue action filed prior to receiver's appointment). Several courts nonetheless have inferred from 12 U.S.C.A. § 1821(d)(3)-(8) and (13) a right to a 180 -day stay of the pending judicial proceeding, requiring the claimant to exhaust the administrative review process before returning to court. See, for example, Gumowitz v. First Fed. S & L Ass'n of Roanoke, 1991 WL 84630 (S.D.N.Y.); In re FDIC, 762 F.Supp. 1002, 1004-05 (D.Mass.1991); Tuxedo Beach Club II, 737 F.Supp. at 20.
 We express no position on whether the 180-day administrative stay of pending proceedings is a proper inference from the statute, especially where the statutory provisions are in tension. We do note, however, that the 180-day stay need not render the 90-day stay of section 1821(d)(12) superfluous, as the court in Tuxedo Beach Club II feared. First, neither the exhaustion of remedies requirement nor the FIRREA administrative claims procedure applies to actions the thrift itself commenced before it went under. And when the failed thrift is the plaintiff and RTC (by virtue of its appointment) is thrust headlong into the ongoing dispute, section 1821(d)(12) is RTC's only means to hold the defendants at bay for a modest period while it familiarizes itself with the history and status of the litigation. Second, neither the administrative stay nor the administrative claims procedure assists RTC in its capacity as conservator of the bridge thrift, rather than receiver of the failed thrift. Section 1821(d)(12)(A)(i), by contrast, specifically applies to lawsuits implicating RTC in its capacity as conservator.
 
 
 [15]
 Other cases RTC cites that have concluded similarly, albeit with little further analysis, include Adams v. Madison Realty & Dev., Inc., 746 F.Supp. 419, 423 (D.N.J.1990), aff'd on other grounds, 937 F.2d 845 (3d Cir.1991), and FDIC v. Norwood, 726 F.Supp. 1073, 1076 (S.D.Tex.1989). In another case decided after RTC filed its briefs in this case, the Eleventh Circuit also held that no hearing was required for a section 1821(d)(12) stay because a stay for 90 days dating from the receiver's request was a statutory entitlement. Lazuka v. FDIC, 931 F.2d 1530, 1538 (11th Cir.1991). Again, however, the court offered little analysis beyond a plain reading of the statute
 
 
 [16]
 See also Hunter's Run I, Ltd. v. Arapahoe County Public Trustee, 741 F.Supp. 207, 208 (D.Colo.1990) (relying on Tuxedo Beach Club I )
 
 
 [17]
 See also H.R.Rep. No. 101-54(I) at 416, 1989 U.S.C.C.A.N. at 212:
 The conservator or receiver has the authority to seek a stay of judicial proceedings, in which it or the failed institution is or becomes a party, for a period of up to 90 days after its appointment.
 
 
 [18]
 See also Tuxedo Beach Club I, 729 F.Supp. at 1509 ("The legislative history of FIRREA indicates that this provision was enacted to give the FDIC receiver enough time to orient itself to the litigation.")
 
 
 [19]
 If Praxis's reading of section 1821(d)(12)(A) is correct, as we indeed hold, then the district court erred in granting RTC a limited 45-day stay and instead should have denied RTC's request for a stay altogether as untimely. Under normal circumstances, Praxis (the appellee in this appeal) would be precluded from raising this argument--which would increase its rights and decrease those of its opponent--absent a cross-appeal. See New Castle County v. Hartford Accident & Indemnity Co., 933 F.2d 1162, 1205 (3d Cir.1991) ("If ... an appellee aspires to alter the trial court's decision (either increasing its rights or decreasing those of its opponent), a cross-appeal is required.")
 However, because (1) our resolution of this appeal will have no direct, practical impact on the parties, and (2) the underlying litigation has settled, we think that the court-appointed advocate for Praxis's position properly advanced the possibility that the court should have granted no stay at all. Considering this possibility here helps us to determine properly the recurring question of the applicability of 12 U.S.C.A. § 1821(d)(12).
 
 
 [20]
 Theoretically, there ought to be a fourth possible outcome--that the receiver is entitled to a stay of 90 days' duration, but only if it so requests within 90 days of appointment. We find it hard, however, to read two types of 90-day limitations into a statute with only one mention of a 90-day limitation. Moreover, nothing in the legislative history about to be discussed suggests that Congress had this solution in mind
 
 
 [21]
 Indeed, this case provides a prime example of when Congress probably did not intend to give RTC an absolute right to a stay. RTC requested a stay more than five months after its appointment and more than four months after Praxis had alerted it to the substance of its claim. During the four months that preceded its request for a stay, RTC and Praxis were locked in heated negotiations regarding the precise subject matter of this lawsuit. Given RTC's obvious familiarity with Praxis's claim, RTC's assertion that it needed breathing room to get up to speed rings hollow. More plausibly, RTC requested a stay under section 1821(d)(12) as a matter of litigation tactics, something Congress surely did not countenance in drafting that subsection
 We are tempted, in fact, to construe section 1821(d)(12) as not requiring a court to stay an action where a claimant has already presented its claims to RTC and had its claims rejected--even if less than 90 days since RTC's appointment have passed. In such a case, RTC would hardly need the breathing room that section 1821(d)(12) was intended to provide. Such an interpretation of subparagraph (A) would ensure RTC a statutory right to breathing room in those situations when it will generally need time, and not when it will not.
 On the other hand, as we have pointed out, the language of section 1821(d)(12) is mandatory and exceptionless. Moreover, we cannot fathom a case when RTC would complete its administrative review and reject the claim within 90 days of its appointment, then seek a stay under section 1821(d)(12). RTC has 180 days from the presentment of the claim to grant or deny the claim, so if RTC wanted to stall, it could simply delay its action on the claim. At any rate, as we discuss below, RTC would only be entitled to a stay for a short period, the balance of the 90 days after appointment. We therefore prefer not to read any post-claim-rejection exception into section 1821(d)(12). In most cases where RTC has already ruled on a claim, more than 90 days from its appointment will have elapsed and, under our holding here, RTC's entitlement to a stay will also have expired.
 
 
 [22]
 Certainly Congress did not intend for the duration to be in the court's discretion. As discussed in Part V.A, subparagraph (B) clearly gives courts no discretion to deny stays for equitable reasons. It would be inconceivable that a court could have no discretion to reject a stay but have complete discretion to restrict the stay's duration